[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON MOTION FOR SUMMARY JUDGMENT (#144)
The defendants move for summary judgment as to counts three, four, five, six, seven, nine, ten thirteen, fourteen, eighteen and nineteen.
On September 20, 2000, the plaintiff, Jeffrey Lewczyk, a former employee of the defendant, department of public health e (DPH), filed a twenty-one count second amended complaint against DPH and five of its employees, including Mary EliseGauline-Kremer, former chief of the bureau of administrative support services, Larry Henry, the plaintiff's former supervisor, Thomas J. Wierbonics, Sr., principal personnel officer, Philip Mollison, manager of data processing, and Joxel Garcia, commissioner. The second amended complaint alleges the following claims: violation of General Statutes § 31-51q against DPH (count one); interference with the plaintiff's first amendment rights in violation of 42 U.S.C. § 1983 against Gaulin-Kremer, Henry, Wierbonics and Mollison (counts two, five, eight and twelve) deprivation of equal protection in violation of 42 U.S.C. § 1983 against Gaulin-Kremer, Henry, Wierbonics and Mollison (counts three, six, nine and thirteen); witness tampering and retaliation in violation of42 U.S.C. § 1985 (2) against Gaulin-Kremer, Henry, Wierbonics and Mollison (counts four, seven, ten and fourteen); violation of the plaintiff's first amendment rights and deprivation of equal protection in violation of 42 U.S.C. § 1983 against Garcia (counts fifteen and sixteen); retaliation in violation of 42 U.S.C. § 2000e-3 (Title VII) against DPH (count seventeen); retaliation and disability discrimination in violation of the Americans with Disabilities Act (ADA) against DPH (counts eighteen and nineteen); and retaliation and disability discrimination in violation of the Connecticut Fair Employment Practices Act against DPH (counts twenty and twenty-one). CT Page 15860 There is no count eleven.
The alleged factual basis for the plaintiff's present action is as follows. The plaintiff was employed by DPH in March, 1987, as a chemist. During the course of his employment, the plaintiff suffered from bipolar disorder, had a stroke and quadruple bypass surgery. During the time period between March, 1987, and September, 1995, the plaintiff was given a flexible work schedule to accommodate his bipolar disorder. He earned four promotions and consistently received excellent performance reviews. In the fall of 1995, the department in which the plaintiff worked was reorganized. The plaintiff began to report to Henry and was no longer permitted to work a flexible schedule. During this time, the plaintiff began to have poor attendance due to periods of depression and his bipolar disorder. He received several warning letters from Henry, which became a part of his personnel file.
In July, 1996, the plaintiff testified at a commission of human rights and opportunities (CHRO) hearing against DPH, for a coworker who had filed a discrimination complaint. In September, 1996, the plaintiff filed his own discrimination complaint with the CHRO. During the next several months, the plaintiff received several letters of reprimand from Wierbonics, alleging that he had problems with tardiness, attendance issues, falsifying time cards, and other things. These letters were placed in his personnel file. In December, 1996, the plaintiff was removed from his position in the laboratory and given a different position. In July, 1997, the plaintiff suffered a panic attack and had to be treated at the Institute for Living, an inpatient facility, for two months. While he was at the facility, he received a letter from Weirbonics informing him that he would be disciplined and possibly terminated if he did not return to work. The plaintiff returned to work part-time in September, 1997. For the next several months, he continued to receive warning letters from Weirbonics, and in December, 1997, the plaintiff served a two-day suspension for alleged tardiness.
On February 12, 1998, the plaintiff filed a lawsuit in federal court against DPH, alleging disability discrimination and retaliation for having participated in the CHRO proceedings. On February 18, 1998, the plaintiff was given the task of administering the agency e-mail and internet systems, which was outside the normal duties of his position. On March 16, 1998, the plaintiff was given permission to pick up his child from school, but later in the week, that approval was removed, and his pay was reduced for the missed work. In September, 1998, the plaintiff was given his annual performance review, which was rated "unsatisfactory" and referred to excessive medical absences. The plaintiff was not given his usual annual salary raise in January of 1999. On July 22, 1999, the CT Page 15861 plaintiff attended an arbitration hearing concerning grievances over his prior unsatisfactory performance evaluations at which Wierbonics, Mollison and several other DPH employees were present. In an off the record discussion, DPH offered to withdraw its opposition to the plaintiff's grievances on the condition that he withdraw his pending federal lawsuit. The plaintiff refused. The next day, the plaintiff was placed on paid administrative leave pending an investigation of his alleged inappropriate workplace behavior. The plaintiff was terminated in mid-August, 1999. The reasons listed in his letter of termination included inappropriate workplace behavior, misuse of his workplace computer, work history and attendance issues.
On July 1, 2002, the defendants in the present case filed a motion for summary judgment as to counts three, four, five, six, seven, nine, ten, thirteen, fourteen, eighteen and nineteen of the second amended complaint. As to counts four, seven, ten and fourteen, alleging witness tampering and retaliation in violation of § 1985(2)against Gaulin-Kremer, Henry, Wierbonics and Mollison, the defendants argue that § 1985(2) does not apply to CHRO proceedings and also that the plaintiff suffered no injury as required by the alleged violation. As to counts five, six and seven, alleging violations of §§ 1983 and 1985(2) against Henry, the defendants argue that because the plaintiff has not identified any legally actionable conduct that Henry took against him during the previous three years, the claims are barred by the statute of limitations. As to counts eighteen and nineteen, alleging retaliation and disability discrimination in violation of the ADA against DPH, the defendants argue that the claims for money damages are barred by theeleventh amendment to the United States constitution in light of recent United States Supreme Court precedent. As to counts three, six, nine and thirteen, alleging equal protection violations against Gaulin-Kremer, Henry, Weirbonics and Mollison, the defendants argue that the claims are defective as a matter of law because no such cause of action is recognized by the courts.
The defendants filed a memorandum of law in support of their motion and attached several documents.[1] The plaintiff filed a memorandum of law in opposition to the motion and attached several documents.[2] The defendants then filed a reply brief in further support of their motion for summary judgment, and the plaintiff filed a sur-reply to the defendants' reply brief along with several documents.[3] The defendants filed a rebuttal in further support of their motion for summary judgment.
As a preliminary issue, the plaintiff argues that a motion for summary judgment may not be used to test the legal sufficiency of a complaint. CT Page 15862 While the grounds for a motion for summary judgment are that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law, the defendants in the present case have used the motion to challenge the legal sufficiency of the plaintiff's equal protection and witness tampering/retaliation claims. The Connecticut Supreme Court has held that the legal sufficiency of a complaint may be challenged after the pleadings have been closed by filing a motion for summary judgment. See Boucher Agency, Inc. v. Zimmer, 160 Conn. 404,408-09, 279 A.2d 540 (1971). Although the Appellate Court in Burke v.Avitabile, 32 Conn. App. 765, 772 n. 9, 630 A.2d 624, cert. denied,228 Conn. 908, 634 A.2d 297 (1993), rejected the use of motions for summary judgment to test the legal sufficiency of a complaint and characterized language in Boucher as "anomalous," a more recent appellate opinion has stated that a motion for summary judgment is a proper procedural vehicle to test the legal sufficiency of a complaint. See Drahan v. Board ofEducation, 42 Conn. App. 480, 498 n. 17, 680 A.2d 316, cert. denied,239 Conn. 921, 682 A.2d 1000 (1996). In addition, a number of Superior Court judges have held that summary judgment is an appropriate vehicle for challenging the legal sufficiency of a complaint.[4] This court concludes that the motion for summary judgement may be used to test the legal sufficiency of a complaint.
"The motion for summary judgment is designed to eliminate the delay and expense of litigating an issue when there is no real issue to be tried."Wilson v. New Haven, 213 Conn. 277, 279, 567 A.2d 829 (1989). "Practice Book § 17-49 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party." (Citation omitted; internal quotation marks omitted.) LaFlamme v. Dallessio, 261 Conn. 247,250, 802 A.2d 63 (2002). "The party seeking summary judgment has the burden of showing the absence of any genuine issue [of] material facts which, under applicable principles of substantive law, entitle him to a judgment as a matter of law . . . and the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact." (Citation omitted; internal quotation marks omitted.) Gaynor v. Payne, 261 Conn. 585, 590-91, 804 A.2d 170
(2002)
"In ruling on a motion for summary judgment, the court's function is not to decide issues of material fact, but rather to determine whether any such issues exist." Nolan v. Borkowski, 206 Conn. 495, 500,538 A.2d 1031 (1988) CT Page 15863
 I COUNTS FOUR, SEVEN, TEN, AND FOURTEEN A
Application of § 1985(2) to Administrative Proceedings
In their memorandum, the defendants argue that § 1985(2) applies only to obstruction of justice in federal or state courts, and therefore does not include state administrative proceedings such as those before the CHRO. The defendants largely base their argument on the United States Supreme Court decision, Kush v. Rutledge, 460 U.S. 719, 103 S.Ct. 1483,75 L.Ed.2d 413 (1983). Contrary to the defendants' argument, based on a plain language reading of the statute, Supreme Court precedent and legislative intent, the second portion of § 1985(2) may be construed as applying to CHRO hearings.
Based on Connecticut's principles of statutory construction,[5] it is clear that the second portion of § 1985(2) can be read to prohibit interference with state administrative proceedings. Section 1985(2) creates a cause of action for obstructing justice, and is divided into two portions. The first part of § 1985(2) provides: "If two or more persons in any State or Territory conspire to deter, by force, intimidation or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such "court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to him, or of his being been such juror. . . ."42 U.S.C. § 1985 (2). The second part of § 1985(2) provides: "[O]r if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course ofjustice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws. . . ." (Emphasis added.) 42 U.S.C. § 1985 (2)
The word "court" does not appear anywhere in the second portion of § 1985(2), while it appears three times in the first portion. In addition, the second portion prohibits "obstructing . . . in any manner, the due CT Page 15864 course of justice in any State or Territory. . . ." (Emphasis added.) § 1985(2). This broad statement supports the plaintiff's argument that the second portion of the statute is not limited to conspiracies to interfere with state court proceedings, but would also encompass conspiracies to interfere with state administrative proceedings. Accordingly this court concludes that based on a plain language reading of the statute, the second portion of § 1985(2), which makes it a violation to "[obstruct] . . . in any manner, the due course of justice in any State," may be read to preclude intimidation of witnesses in a state administrative proceeding.
The defendants cite Kush v. Rutledge, supra, 460 U.S. 719, for the proposition that "the second portion [of § 1985(2)] applies to conspiracies to obstruct the course of justice in state courts," and argue that the statute therefore does not apply to CHRO proceedings. (Defendants' Memorandum, p. 11.) The court's analysis in Kush involved the statutory construction of § 1985 and was limited to the narrow issue of whether an action brought under the first clause of § 1985(2) requires an allegation of class-based animus, as does an action brought under the first clause of § 1985(3). The court, relying on a plain language reading of the Civil Rights Act of 1871 and also examining the legislative history, held that it did not. "[T]he statutory language that provides the textual basis for the class based, invidiously discriminatory animus requirement simply does not appear in [the first portion of § 1985(2)]." (Emphasis added; internal quotation marks omitted.) Kush v. Rutledge, supra, 460 U.S. 726.
The portion of the present case that deals with intimidation of the plaintiff as a witness to CHRO hearings is brought under the second portion of § 1985(2). As discussed above, the word "court" simply does not appear anywhere in the second portion, while it appears three times in the first portion. While the United States Supreme Court in Kush v.Rutledge, supra, 460 U.S. 725, stated that "[t]he second part of § 1985(2) applies to conspiracies to obstruct the course of justice in state courts," this was not its holding, as the defendants argue. The court has not stated that the second portion of § 1985(2) is limited
to obstruction of justice in state courts, or that it is inapplicable to obstruction of justice in other types of state proceedings, such as state administrative proceedings. Instead, Kush stands for the proposition that the equal protection clause that is present in the second portion of § 1985(2) is not to be read into the first portion of the statute, thus reasoning that the two portions are to be read separately and distinctly.
No court has expressly held, however, that the second portion of § CT Page 15865 1985(2) applies to interference with state administrative proceedings. The one case cited by the plaintiff for the proposition that "the language of Section 1985 may be sufficiently broad to encompass conspiracies to obstruct discrimination proceedings [in a state administrative agency] "; Fowler v. Dept. of Education, 472 F. Sup. 121,122 (E.D. Va. 1978); was decided pre-Kush, and was later criticized by the same court in Roper v. County of Chesterfield, Virginia,807 F. Sup. 1221, 1226 (E.D.Va. 1992) (stating that virtually all courts have held that second portion of § 1985(2) applies to conspiracies to obstruct course of justice in state courts). The reason for this is likely a misreading of the court's holding in Kush. The Supreme Court precedent establishes that the two portions of § 1985(2) are to be read separately and distinctly.
Moreover, the legislative intent supports a broad reading of § 1985(2). "The statutory provision that is now codified as § 1985 of Title 42 of the United States Code was originally enacted as § 2 of the Civil Rights Act of 1871 [also known as the Ku Klux Klan Act],17 Stat. 13. The length and style of § 2 of the 1871 Act . . . make it somewhat difficult to parse. Nevertheless, if its several components are carefully identified, its meaning becomes clear." Kush v. Rutledge, supra, 460 U.S. 724.
In introducing the bill, Representative Shellabarger, Chairman of the House Select Committee which drafted the Ku Klux Klan Act, stated: "This act is remedial, and in aid of the preservation of human liberty and human rights. All statutes and constitutional provisions authorizing such statutes are liberally and beneficially construed. . . . [T]he largest latitude consistent with the words employed is uniformly given in construing such statutes and constitutional provisions as are meant to protect and defend and give remedies for their wrongs to all the people." Cong. Globe, 42d Cong., 1st Sess., App. p. 68.
"The approach of [the United States Supreme Court] to [the] Reconstruction civil rights statutes . . . has been to accord [them] a sweep as broad as [their] language." (Internal quotation marks omitted.)Griffin v. Breckenridge, 403 U.S. 88, 97, 91 S.Ct. 1790, 29 L.Ed.2d 388
(1971). Reasons for the enactment of the Ku Klux Klan Act of 1871 included "[p]rotection of civil rights . . . [and] [r]estoration of civil authority. . . . The statute has its roots in the racial violence that erupted in the southern states at the end of the Civil War. . . . Throughout the deliberations . . . in the house and Senate, a recurring theme was that the need to preserve orderly government mandated enactment of [the] . . . bill." McCord v. Bailey, 636 F.2d 606, 615 (D.C. Cir. CT Page 15866 1980), cert. denied, 451 U.S. 983, 101 S.Ct. 2314, 68 L.Ed.2d 829
(1981).
The defendants argue that § 1985(2) does not apply explicitly to state agency proceedings because state agencies like the CHRO did not even exist at the time that the statute which formed the basis for § 1985(2) was enacted. In response, the plaintiff directs attention back to the plain language of the statute, which makes "impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory" a violation. (Emphasis added.) 42 U.S.C. § 1985
(2). The court finds that if Congress had intended to limit the scope of this clause of § 1985(2) in any significant way, it could have easily done so by declining to draft such expansive language. Furthermore, in the decades subsequent to the creation of state administrative agencies like the CHRO, and the rapid growth of state regulatory power, Congress has declined to amend or alter the language of § 1985 in any manner. In addition, the court finds that an interpretation of § 1985(2) which permits [parties] to harass and intimidate parties and/or witnesses when they attempt to bring discrimination claims [before] a state agency, [which is] a necessary precursor to any state or federal litigation under Title VII, would defeat the original purpose of § 1985(2) by preventing those parties from eventually bringing suit in either state of federal court. Because the legislative history evinces a broad purpose for § 1985(2), the statute may be read as prohibiting interference with administrative agency proceedings.
The defendants argue that even if the second portion of § 1985(2) did apply to administrative proceedings, the plaintiff's claim is barred for lack of standing to the extent that it is based on his participation as a witness at his coworker's CHRO proceedings. They argue that courts have interpreted § 1985(2) to provide relief only to a party whose proceedings were interfered with, and not to witnesses.
There is currently a split of authority among the federal courts regarding this issue. Two Courts of Appeals have concluded that relief is not available for witnesses,[6] and two Courts of Appeals have held that the term "party," as used in § 1985(3), when read along with § 1985(2), was meant to refer to both parties and witnesses.[7] The United States Supreme Court has expressly declined to resolve the issue, stating that "[w]e express no opinion regarding respondents' argument . . . that only litigants, and not witnesses, may bring § 1985(2) claims. We leave [that] [issue] for the courts below to resolve on remand." Haddle v. Garrison, 525 U.S. 121, 125 n. 3, 119 S.Ct. 489,142 L.Ed.2d 502 (1998) CT Page 15867
In Heffernan v. Hunter, 189 F.3d 405, 410 (3rd Cir. 1999) the Court of Appeals for the Third Circuit held that "a witness or juror may be a "party' entitled to maintain an action under section 1985(2)." In that decision the court examined the statute to determine its precise meaning. The court stated that [t]o properly interpret section 1985, it is necessary to compare the original and codified texts. Both prescribed conspiracies to deter "any party or witness.'. . . However, codification brought unsettling changes to the remedy section, which now states that "the party so injured . . . may have an action for the recovery of damages.'" Id. The court stated that "after patient parsing of the text [of § 1985], it is clear enough that Congress' intent was to extend protection to witnesses and jurors as well as to parties. The word "persons' as used in the 1871 version accomplished that result and the codified text need not be read as inconsistent with the original. The word "party' may well have been, in the codifiers' minds, simply a synonym for person' or "individual.'" Id. "We reach the same conclusion even if we do not look to the original text. The codified remedy section states that if one or more conspirators "do . . . any act in furtherance of the . . . conspiracy, whereby another is injured in his person or property . . . the party so injured or deprived may have an action for the recovery of damages.' 42 U.S.C. § 1985 (3). In this clause, "the party so injured' refers back to the phrase "whereby another is injured.' The phrasing and context persuade us that the term "party' is not meant to limit the more general term "another.' Thus, the meaning of "another' in the section 1985(2) context is not defined by section 1985(3)'s reference to "party," but rather by section 1985(2)'s reference to parties, witnesses, and jurors." Id. This court finds Heffernan persuasive and adopts its line of reasoning to hold that § 1985(2) may be construed as protecting witnesses.
 B Sufficiency of Allegations
According to the Court of Appeals for the Ninth Circuit in Rutledge v.Arizona Bd. of Regents, 859 F.2d 732, 735 (9th Cir. 1988), a § 1985(2) claim requires a showing of "(1) a conspiracy between two or more persons, (2) to deter a witness by force, intimidation, or threat from attending a federal court or testifying freely in a matter there pending, which (3) causes injury to the claimant." The defendants argue that the plaintiff cannot establish that he was injured in any way by the defendants' alleged actions in his federal court case. The plaintiff cannot do this, the defendants argue, because his ability to present an effective case was not hampered because he testified at length, and without constraint in a deposition over the course of three days and CT Page 15868 voluntarily settled his federal court claims for a substantial amount.
The plaintiff argues that his termination alone is sufficient injury to make out a claim under § 1985(2). In Haddle v. Garrison, supra,525 U.S. 121, the United States Supreme Court granted certiorari in order to resolve the circuit split on the issue of whether the loss of at-will employment was sufficient to satisfy the injury element for the purposes of a § 1985(2) claim. The court, reasoning that "[t]he gist of the wrong at which § 1985(2) is directed is not deprivation of property, but intimidation or retaliation against witnesses in federal-court proceedings," held that "third-party interference with at-will employment relationships . . . states a claim for relief under § 1985(2)." Id., 125-26. In the present case, the plaintiff argues that because he had a union contract and was protected by a just cause termination clause, he had even greater protection than those held by at-will employees.
In Brever v. Rockwell International Corp., 40 F.3d 1119, 1129 (10th Cir. 1994), the court stated that because "[t]he purpose of section 1985(2) is to protect citizens in the exercise of their statutory and constitutional rights . . . [it] would clearly be undermined if defendants who, despite their best efforts, were unsuccessful in keeping a witness off the stand can avoid the consequences of their actions." The court finds the reasoning of the Court of Appeals for the Tenth Circuit to be persuasive. The fact that the plaintiff testified at deposition and voluntarily settled his lawsuit does not mean that he was not "injured" for purposes of § 1985(2). The part of the plaintiff's action that is brought under the first part of § 1985(2) alleges that there was a conspiracy to deter him from testifying in federal court. The fact that the plaintiff testified at his deposition does not negate the possibility of such a conspiracy. Furthermore, the plaintiff alleges that he was harassed and ultimately terminated from his employment, in part in retaliation for bringing his federal lawsuit. This court concludes that the plaintiff has alleged sufficient injury for his § 1985(2) claim to survive the defendants' motion for summary judgment.
The defendants argue that the plaintiff has not identified any evidence that links his termination to his federal lawsuit. They argue that the allegedly retaliatory actions occurred long before he filed his federal lawsuit and that the plaintiff cannot contend that these actions were related to his federal proceedings. The defendants argue that the plaintiff relies on a purely circumstantial connection based on the fact that he filed his lawsuit and, eighteen months later, was terminated. The defendants argue that such a tenuous showing is insufficient to withstand summary judgment. CT Page 15869
The plaintiff's claim under the first portion of § 1985(2) is two-fold. The complaint alleges that the defendants' actions were not only meant to retaliate against him from having filed his federal lawsuit, but also to deter him from continuing to pursue it. The plaintiff has submitted an affidavit in which he details events that occurred from the time he filed his federal lawsuit until his termination. (Affidavit of Jeffrey J. Lewczyk, dated July 30, 2002, ¶¶ 48-78.) He has also submitted several documents, including a performance evaluation, deposition testimony of various defendants, and letters from Wierbonics. (See Plaintiff's Memorandum, Exhibits 17-22, 25-27.)
The plaintiff filed his federal lawsuit on February 12, 27-1998. The next week he was given additional clerical duties that were not part of his job description. In March, 1998, the plaintiff's pay was reduced for leaving work to pick up his child, although this had been previously approved. In September, 1998, the plaintiff was given an unsatisfactory performance review, and then was not given his usual salary raise in January of 1999. On July 22, 1999, the plaintiff attended an arbitration hearing concerning grievances over his prior unsatisfactory performance evaluations. An off the record discussion occurred and DPH offered to withdraw its opposition to the plaintiff's grievances if he would withdraw his pending federal lawsuit. The plaintiff refused. The next day, July 23, 1999, the plaintiff was placed on paid administrative leave pending an investigation of his alleged inappropriate workplace behavior. He was then terminated from his position in August, 1999. This court finds that the plaintiff has provided sufficient evidence to establish a genuine issue of material fact as to whether there was a conspiracy in violation of § 1985(2), to retaliate against the plaintiff for bringing his federal lawsuit and to deter him from pursuing it.
The defendants argue that the witness intimidation claim is further defective because the plaintiff has not identified any evidence of violent or threatening conduct. They state that the plaintiff does not contend that the defendants ever threatened him or engaged in violent conduct in connection with his federal lawsuit. The defendants only cite one District Court opinion in support of their position. In Patterson v.McCarron, 2001 U.S. Dist. LEXIS 19099 (S.D.N.Y. 2001), the court granted summary judgment dismissing the plaintiff's claim for termination in violation of § 1985(2) because it concluded that the construction of the statute was one that required a showing of violent or threatening conduct. Nonetheless, in Haddle v. Garrison, supra, 525 U.S. 125 n. 3, apparently the only appellate decision to address the issue, the Supreme Court explicitly left open the issue, stating that "[w]e express no opinion regarding the respondents' argument that intimidation claims under CT Page 15870 § 1985(2) are limited to conduct involving force or threat of force. . . . We leave [that] [issue] for the courts below to resolve on remand."
The first part of § 1985(2) proscribes conspiracy "to deter, by force, intimidation or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified. . . ." (Emphasis added.) 42 U.S.C. § 1985 (2). The plain language of the statute does not limit claims to those conspiracies involving violent or threatening conduct. The court finds that § 1985(2) was meant to be liberally construed and therefore does not require a showing of violent or threatening conduct for an intimidation claim. Accordingly, the motion for summary judgment as to counts four, seven, ten and fourteen is denied.
 II COUNTS FIVE, SIX, AND SEVEN
The defendants argue that the claims against Henry in counts five, six and seven are time-barred by the three-year statute of limitations contained in General Statutes § 52-577 because the plaintiff has not identified any specific conduct that Henry took against him during the limitation period. According to the plaintiff, the complaint references continued involvement on the part of Henry.
"Summary judgment may be granted where the claim is barred by the statute of limitations." Doty v. Mucci, 238 Conn. 800, 806, 679 A.2d 945
(1996); see also Burns v. Hartford Hospital, 192 Conn. 451,472 A.2d 1257 (1984)." [T]he three year statute of limitations contained in General Statutes § 52-577 has been held as the operative statute of limitations in a § 1983 action." Orticelli v.Powers, 197 Conn. 9, 16, 495 A.2d 1023 (1985) citing Williams v. Walsh,558 F.2d 667, 670-71 (2d Cir. 1997) "The Supreme Court held in Wilsonv. Garcia, 471 U.S. 261, 276, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), that42 U.S.C. § 1983 actions are best characterized as personal injury actions for the purpose of determining the applicable statute of limitations." Orticelli v. Powers, supra, 197 Conn. 16 n. 3. The same statute applies to claims brought under § 1985. See Cornwell v.Robinson, 23 F.3d 694, 703 (2d . Cir. 1994). The parties agree that in order to satisfy the three-year statute of limitations applicable to each claim against Henry, the plaintiff is required to show that Henry took adverse employment action against him after February 2, 1997. (See CT Page 15871 Plaintiff's Memorandum, p. 29; Defendants' Memorandum, p. 9.)
The defendants largely base their argument that Henry did not take any such action against the plaintiff after the limitation period on the fact that Henry was no longer the plaintiff's supervisor when the alleged retaliation began after July 25, 1996. In opposition, the plaintiff argues that a genuine issue of material fact exists as to whether Henry participated in the 1999 investigation and termination of him. The plaintiff has attached deposition testimony of both Frank Bochniewicz and Gaulin-Kremer. Bochniewicz, who was assigned in July, 1999, to investigate the plaintiff, stated that he interviewed Henry at some length about his relationship and experience with the plaintiff. (Plaintiff's Memorandum, Exhibit 26, Deposition of Frank Bochniewicz, dated August 29, 2000, pp. 66-67.) Gaulin-Kremer, who was a member of the investigative team, stated that this information was used to make the decision to terminate the plaintiff. (Plaintiff's Memorandum, Exhibit 27, Deposition of Mary Elise Gaulin-Kremer, dated April 8, 2002, p. 312.) The defendants have not submitted any evidence to counter these statements, but merely attempt to minimize them.
There remain genuine issues of material fact as to the role that Henry played in the plaintiff's termination. Accordingly, the defendants' motion for summary judgment as to counts five, six and seven is denied.
 III COUNTS EIGHTEEN AND NINETEEN
In their memorandum, the defendants argue that the plaintiff's claims for damages under the ADA are barred by the eleventh amendment to the United States constitution based on the recent United States Supreme Court decision, Board of Trustees of the University of Alabama v.Garrett, supra, 531 U.S. 356. In his memorandum in opposition and again at oral argument on August 2, 2002, the plaintiff has stated that he withdraws the portions of counts eighteen and nineteen that request money damages. (Plaintiff's Memorandum, p. 31.) The plaintiff maintains, however, his claims against DPH requesting injunctive relief that the defendants cease all harassment, remedy all discrimination and reinstate him to his former assignment.
The United States Supreme Court, in Board of Trustees of the Universityof Alabama v. Garrett, supra, 531 U.S. 374 n. 9, stated that "[o]ur holding here that Congress did not validly abrogate the States' sovereign immunity from suit by private individuals for money damages under Title I does not mean that persons with disabilities have no federal recourse CT Page 15872 against discrimination. Title I of the ADA still prescribes standards applicable to the States. Those standards can be enforced by the United States in actions for money damages, as well as by private individuals in actions for injunctive relief under Ex parte Young, 209 U.S. 123,28 S.Ct. 441, 52 L.Ed. 714 (1908)." The defendants did not address the plaintiff's request for injunctive relief.
In light of the court's decision in Board of Trustees of the Universityof Alabama v. Garrett, supra, 531 U.S. 356, the plaintiff is barred from bringing an action for money damages against DPH, the defendants' motion for summary judgment as to counts eighteen and nineteen is granted, insofar as those counts relate to money damages. The plaintiff may still maintain an action against DPH for injunctive relief.
 IV COUNTS THREE, SIX, NINETEEN AND THIRTEEN
In their memorandum, the defendants argue that the plaintiff's equal protection retaliation claim must be dismissed because no such cause of action is recognized by the courts. The Court of Appeals for the Second Circuit has stated that "we know of no court that has recognized a claim under the equal protection clause for retaliation following complaints of racial discrimination." Bernheim v. Litt, 79 F.3d 318 (2d Cir. 1996).
As the plaintiff argues in his memorandum in opposition, however, the Court of Appeals for the Second Circuit in LeClair v. Saunders,627 F.2d 606, 609-10 (2d Cir. 1980), cert. denied, 450 U.S. 959,101 S.Ct. 1418, 67 L.Ed.2d 383 (1981), set up a two-part test for a § 1983 equal protection violation based on selective treatment. That test was adopted by the Connecticut Supreme Court as follows: "[L]iability in the instant type of equal protection case should depend on proof that (1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent toinjure a person." (Internal quotation marks omitted.) Schnabel v. Tyler,230 Conn. 735, 762, 646 A.2d 152 (1994). "[When a plaintiff] does not allege selective treatment based upon his race, religion, or any intentional effort by [the] defendants to punish him for exercising his constitutional rights, [the plaintiff] must demonstrate that [the] defendants maliciously singled [him] out . . . with the intent to injure him." (Internal quotation marks omitted.) Thomas v. West Haven,249 Conn. 385, 393, 734 A.2d 535 (1999), cert. denied, 528 U.S. 1187,120 S.Ct. 1239, 146 L.Ed.2d 99 (2000); see also LeClair v. Saunders, supra, CT Page 15873627 F.2d 743 (stating that "where no invidious discrimination or interference with the exercise of other express constitutional rights has occurred, the malice/bad faith standard should be scrupulously met")
In the present case, the plaintiff has alleged that the defendants have retaliated against him with numerous instances of allegedly unjustified progressive discipline which ultimately resulted in his termination, for exercising his constitutional rights in appearing as a witness in a CHRO hearing, by filing his own CHRO complaint, and by filing his lawsuit in federal court, all in bad faith. (Second Amended Complaint, ¶ 80, Counts Three, Six, Nine and Thirteen.) This court finds that the plaintiff has alleged sufficient facts to establish a § 1983 equal protection claim for selective treatment.
 CONCLUSION
For the foregoing reasons, the defendants' motion for summary judgment as to counts three, four, five, six, seven, nine, ten, thirteen and fourteen is denied. The defendants' motion for summary judgment as to counts eighteen and nineteen is granted, by concession of the plaintiff insofar as these counts seek money damages. The motion for summary judgment is denied, however, as to counts eighteen and nineteen insofar as they seek injunctive relief.
 ___________________ Hennessey, J.